UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ENAS PUBENTZ,                        )
                                     )
                    Plaintiff,       )
                                     )
        vs.                          )            10 C 7722
                                     )
ERIC H. HOLDER, JR., Attorney General, )
U.S. Department of Justice, et al.,  )
                                     )
                    Defendants.      )

## MEMORANDUM OPINION

CHARLES P. KOCORAS, District Judge:

Plaintiff Enas Pubentz ("Pubentz"), a Federal Bureau of Investigation ("FBI")

linguist, filed a four-count amended complaint alleging national origin discrimination

and retaliation in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e,

*et seq*., and a First Amendment retaliation claim. Defendants Eric Holder, Jr., U.S.

Attorney General; and Robert Mueller, III, Director of the FBI; (collectively

"Defendants") bring the present motion for summary judgment pursuant to Federal Rule

of Civil Procedure 56. For the following reasons, Defendants's motion is granted.

# BACKGROUND[1]

Pubentz is a female United States citizen of Israeli national origin. Pubentz has worked as an FBI Language Analyst since 2003. Her duties include translating oral and written materials. Pubentz's work product has generally been regarded as well done and she received accolades for the quality of her work product.

## Chicago FBI Office

In August 2008, while serving in a managerial role as a relief supervisor, an FBI agent requested Pubentz to assist him with an emergency translation matter requiring immediate clarification. Pubentz complied, and the agent was happy with her work. However, Pubentz's supervisor at the time, Martha Salazar ("Salazar"), cited Pubentz for her failure to follow FBI protocol in two respects. Protocol required Pubentz to direct the requesting FBI agent to the analyst's respective supervisor, so that the matter could be appropriately assigned, instead of the assignment being unilaterally accepted. Salazar noted that if the situation were in fact an emergency, FBI procedural protocol requires the analyst to notify her supervisor in a timely fashion. Pubentz did not contact

---

[1]The following facts are taken from the parties' respective statements and exhibits filed pursuant to Northern District of Illinois Local Rule 56.1. The Court reviews each Local Rule 56.1 statement and disregards any argument, conclusion, or assertion unsupported by the evidence in the record. The Defendants object to the form of Pubentz's statement of facts. Although Pubentz does not strictly adhere to the requirements of Local Rule 56.1, the responses do not amount to a total non-compliance with Local Rule 56.1 which is significant enough to warrant ignoring Pubentz's statement of facts. Defendants 's objection is overruled.

Salazar at anytime to inform her of the assignment. Salazar documented this incident in Pubentz's October 2008 performance appraisal and gave her a rating of "minimally successful" in the category of "maintaining high professional standards." Salazar gave Pubentz a "satisfactory" rating in the category concerning the quality of her work product. On October 14, 2008, Salazar removed Pubentz from her position as a relief supervisor. Pubentz made efforts to appeal the "minimally successful" rating and was not successful.

In early December 2008, an email was sent to all linguists soliciting candidates to serve as relief supervisors. The qualifications stated in the email required a "successful" or higher rating on all critical elements of the most recent performance evaluation and no occurrences of poor professionalism or failure to comply with FBI policies and procedures within the last 12 months. In spite of Pubentz's removal from her position as a relief supervisor in October 2008, she asked Salazar about her viability for submitting a successful application. Neither England nor Salazar recommended her for the relief supervisory position.

Colleen England ("England") took over as Pubentz's supervisor in late December 2008. In January 2009, FBI Agent Chris Carlin ("Carlin") arranged a voluntary training event and invited a Palestinian speaker to come to the Chicago FBI Office to discuss the conflict involving Israel and Hamas in the Gaza Strip. The purpose of the training was

to present a distinct perspective to help FBI employees perform their duties.[2] Pubentz viewed the presentation as being skewed in favor of the plight of Palestinians and unrepresentative of the actual conflict.

Prior to the event, England sent an e-mail informing attendees that they should not enter into a confrontational debate with the speaker. Pubentz never received the email prior to the event. The presentation took place at a training space at the Chicago FBI Office. During the course of the presentation Pubentz challenged the speaker on several of his points and implied that the facts given by the speaker were fabricated, in the interest of providing a skewed version of his account. Carlin, in attendance, determined that Pubentz conducted herself in a manner that was out of line and was not how a guest in an FBI space should be treated.

After the event, Pubentz sent an email to England, informing her about what transpired at the event. Pubentz's email stated; "before you hear it through the grapevine, I did bring up a few points during the presentation, being that I am from the region and I'm well informed about the speaker insisted to be facts. I hope I didn't cause any problems by doing so . . . ." Carlin met with England after the presentation and in the course of explaining the confrontation between Pubentz and the speaker, he

_____

[2]Pubentz objects to England's asserted purpose for the Palestinian training event. Pubentz argues that since England did not attend the presentation she could not have known the nature of the lecture. England does not have to be in attendance of the event to know the purpose the event was to serve. Pubentz's objection is overruled.

referred to Pubentz as a "Zionist Arab." After England received the post-event email from Pubentz and fielded comments from Carlin, and other attendees, England drew the conclusion that Pubentz conducted herself in an inappropriate manner.[3] England told Pubentz that when she communicates in a hostile and persistent manner, people do not want to collaborate with her and they distrust her ability to be objective and open minded, two important qualities of an analyst. In February 2009, England sent Pubentz an email discussing with her areas she should improve if she wanted to be considered for a promotion, including improving her time management, being more respectful in emails to co-workers, not embarrassing the FBI in forums with community representatives, and maintaining good relations with her coworkers.

FBI linguists work under the GS pay schedule which ranges from level GS-7 to GS-13. Linguists who achieve the GS-13 level are expected to perform with an increased level of responsibility. Pubentz has never applied for promotion to GS-13. For promotion to level GS-13, a candidate must have demonstrated leadership as well as possess a heightened proficiency in using language skills in an intelligence environment. The decision to promote a linguist to the GS-13 level is made by a

---

[3]Pubentz asserts that England's conclusion that Pubentz conducted herself in an inappropriate manner is hearsay. England's conclusion was based on the feedback she received from other members of the audience that saw Pubentz interact with the presenter. England's opinion is not being used establish the proof of the matter asserted, that Pubentz conducted herself in an inappropriate manner. *See* Fed. R. Evid. 801. England's conclusions served as the basis for her to make managerial decisions.

promotion board, organized by national language service managers at the Washington D.C., FBI headquarters. The decision is based on a promotion package, prepared by the linguist, which must provide examples, narrative details, and work samples to show the candidate's achievement under demonstrated competencies as set forth in the FBI promotional policy.

Pubentz discussed with England the viability of an application for promotion to the GS-13 pay scale on multiple occasions. England voiced her concerns regarding Pubentz's professionalism and disregard for authority. She also reviewed with Pubentz the criteria for the GS-13 package, which requires that the candidate regularly work at the GS-13 level. England told Pubentz that in her opinion her work was not sufficient for a GS-13 level position and the best time for preparing her GS-13 package would be after she improved her performance rating. England told her that the Assistant Special Agent in Charge ("ASAC") Mitchell Marrone ("Marrone") had returned a GS-13 promotion package from a different applicant because the applicant's overall rating was only at a "successful" level. However, Pubentz's most recent rating was only "minimally successful" in the area of professionalism.

On April 10, 2009, Pubentz met with an Equal Employment Opportunity ("EEO") counselor to explore her ability to file a discrimination complaint. Two weeks later on April 22, 2009, Pubentz sought the counsel of ASAC Marrone and met with

him in his office to discuss workplace issues that she was encountering. Pubentz discussed how she was denied training opportunities and England's decision not to recommend her for a promotion. Pubentz eventually told Marrone that she intended to file an Equal Employment Opportunity Commission ("EEOC") charge concerning Carlin's comment calling her a "Zionist Arab." Marrone felt that proceeding with the conversation concerning an EEOC discrimination claim would be inappropriate. The meeting was promptly concluded and Marrone asked Pubentz to leave his office. On May 8, 2009 Pubentz filed an EEOC charge alleging that she was subjected to discrimination because of her sex and national origin.[4]

**San Francisco FBI Office**

Unhappy with her work environment in Chicago, Pubentz applied for a transfer to San Francisco, California. Management in Chicago accommodated Pubentz's request and she was allowed to move within three months of her request for transfer. In August 2009 Pubentz began in the San Francisco FBI Office. From the beginning of her time in San Francisco until the present time, Pubentz's supervisor has been Foreign Language Program Coordinator William Reilly ("Reilly"). Reilly had never spoken

---

[4] Pubentz's May 8, 2009 EEOC charge cites her sex and national origin as being the precipitating factors which form the basis of her charge. Pubentz's amended complaint cites national origin and race as the basis for the Defendants' discriminatory actions. For the purpose of determining the instant motion only Pubentz's claim of national origin discrimination will be assessed due to the absence of race discrimination on her EEOC charge. *Dear v. Shinseki,* 578 F.3d 605, 609 (7th Cir. 2009) (the EEOC charge and the complaint must "describe the same conduct and implicate the same individuals.").

with England or any members of the Chicago FBI Office's management team about Pubentz prior to her transfer. Reilly was not aware of Pubentz's EEOC case prior to her arrival. He became aware of the case in August 2009, when he assisted Pubentz in setting up an interview with an EEO investigator concerning Pubentz's Chicago EEOC charge.

In September 2009, Pubentz asked Reilly to recommend her for a supervisory position. Reilly advised Pubentz that he appreciated her interest in the position, however because she had recently started working for him and he had limited knowledge of her performance that he could not recommend her at that time.

In late 2009, Pubentz was assigned to perform the translation work for a complex national security investigation. After receiving the assignment Pubentz failed to forward any completed work to the agent assigned to the case. Special Agent David Miller ("Miller")[5] met with Pubentz to discuss her lack of progress. Pubentz told the agent that she would make the determinations on what to report and what not to report, based on her perception of what was pertinent.

---

[5] Pubentz objects to the use of Special Agent David Miller and Supervisory Special Agent Enrique Alvarez as a witness to provide the circumstances which led to Pubentz's placement on PIP. The record indicates that on March 20, 2012 an email was sent to Pubentz's counsel offering deposition dates. On March 27, 2012 a letter was faxed to Pubentz's counsel indicating that David Miller would be a potential defense witness. Pubentz's objection is overruled.

In early 2010 Pubentz again asked Reilly if he would recommend her for a promotion to a supervisory position. Despite Pubentz's "successful" rating on her January 2010 performance appraisal Reilly did not recommend her as a relief supervisor. Reilly informed Pubentz that she was welcome to submit an application but that she should not expect his endorsement because he determined that she had not exercised sound judgment in a leadership role. Furthermore on March 15, 2010 Reilly advised Pubentz that she would not be approved to participate in any training unrelated to her analyst duties or her general development as a Bureau employee. On May 18, 2010 Pubentz contacted an EEO counselor in San Francisco concerning the alleged retaliatory conduct of Reilly.

On June 7, 2010, Reilly notified Pubentz that she was being placed on a Performance Improvement Plan ("PIP") for a period of 90 days. Pubentz was placed on a PIP within two months of contacting her EEO counselor. Pubentz successfully completed the PIP, and eventually returned to her translation work. Pubentz's return back to her analyst position was conditioned on her commitment not to object to the nature of the translations assigned to her. On September 17, 2010, Pubentz filed a second EEOC charge alleging she was retaliated against in the San Francisco FBI Office as a result of the previous EEOC charge she filed in Chicago.

On March 15, 2011, Pubentz filed a four count amended complaint alleging, discrimination in violation of Title VII (Count I); retaliation in violation of Title VII (Counts II and III); and retaliation in violation of the First Amendment (Count IV).  On July 18, 2012 the Defendants moved for summary judgment under Federal Rule of Civil Procedure 56.

## LEGAL STANDARD

Summary judgment is appropriate when the pleadings, discovery, disclosures, and affidavits establish that there is no genuine issue of material fact, such that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a);  *Winsley v. Cook Cnty.*, 563 F.3d 598, 602-03 (7th Cir. 2009).  The moving party bears the initial burden of showing that no genuine issue of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The burden then shifts to the non-moving party to show through specific evidence that a triable issue of fact remains on issues on which the non-movant bears the burden of proof at trial.  *Id.*  The non-movant may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; she must go beyond the pleadings and support her contentions with proper documentary evidence.  *Id.*  The court considers the record as a whole and draws all reasonable inferences in the light most favorable to the party opposing the motion. *Bay v. Cassens Transport Co.*, 212 F.3d 969, 972 (7th Cir. 2000).  A genuine issue of material fact

exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, a court construes all facts and draws all reasonable inferences in favor of the non-moving party. *Smith v. Hope Sch.*, 560 F.3d 694, 699 (7th Cir. 2009).

## DISCUSSION

Pubentz alleges that the Defendants violated Title VII and the First Amendment over the course of her employment with the FBI as a Language Analyst. The first three counts allege that the Defendants violated Title VII when they discriminated against her on the basis of her national origin and additionally retaliated against her after she filed two EEOC charges, initially in Chicago and subsequently in San Francisco. The fourth, and final count alleges that the Defendants retaliated against her after exercising her First Amendment Right of Free Speech.

## I. Discrimination on the Basis of National Origin (Count I)

Pubentz alleges that she experienced discrimination on the basis of her national origin in violation of Title VII. Title VII prohibits employers from "discriminat[ing] against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The Court notes that Pubentz's allegations

of workplace misconduct are so numerous that relegating which incidents she considers an adverse employment action has proven challenging. In the interest of providing a thorough assessment of her claims we analyze each allegation of an adverse employment action that she plausibly asserts. Pubentz argues that she can establish her Title VII discrimination claim in two ways. First, Pubentz seeks to use the indirect method to prove her disparate treatment claim for conduct which occurred during her tenure in Chicago. Second, Pubentz alleges that the Defendants subjected her to a hostile work environment in both Chicago and San Francisco. The Court will examine both methods of establishing a Title VII discrimination claim.

### A. Disparate Treatment Claim under the Indirect Method

A plaintiff may establish a claim under Title VII by either the direct or indirect method. *Silverman v. Board of Educ. of the City of Chicago*, 637 F.3d 729, 733 (7th Cir. 2011). Here, Pubentz attempts to prove her claim only under the indirect method. To prove discrimination under the indirect method, Pubentz must establish that: 1) she is a member of a protected class; 2) her job performance met her employer's legitimate expectations; 3) she suffered an adverse employment action; and 4) at least one similarly situated employee, not in her protected class, was treated more favorably. *See Naik v. Boehringer Ingelheim Pharm., Inc.*, 627 F.3d 596, 599-00 (7th Cir. 2010) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). If these elements are

established, discrimination is inferred and the burden of production shifts to the defendants to raise a legitimate, nondiscriminatory reason for the adverse employment action. *Naik*, 627 F.3d at 600. Once a legitimate reason is offered, the inference of discrimination is rebutted, and the plaintiff must establish that the offered reason is a pretext for unlawful discrimination. *Id*.

Pubentz claims that the Defendants, 1) failed to credit her work performance on two terrorism cases in 2007 and her removal from her relief supervisory position in 2008; 2) called her a "Zionist Arab;" 3) refused to recommend her for a pay grade increase and a supervisory position; 4) displayed an unwillingness to discuss her workplace complaints; and 5) refused to allow her to participate in training opportunities on several different occasions. Each of Pubentz's claims in her amended complaint are framed as separate disparate acts of discrimination. The parties contest whether Pubentz suffered an adverse employment action and whether Pubentz has provided a similarly situated employee not in her protected class who was treated more favorably. The Court will address each contested issue in order.

**1. Adverse Employment Action**

Pubentz claims that she suffered a multitude of adverse employment actions during the course of her tenure in Chicago. Claims under Title VII may arise out of a tangible, adverse employment action such as a termination, a demotion, or a failure to

promote. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). "[T]he purpose of the adverse employment action requirement is to provide a reasonable limiting principle for the type of conduct actionable under the statute." *Phelan v. Cook County*, 463 F.3d 773, 780 (7th Cir. 2006). "[An] adverse job action must be materially adverse, meaning more than a mere inconvenience or an alteration of job responsibilities." *Ribando v. United Airlines, Inc.*, 200 F.3d 507, 511 (7th Cir. 1999). "While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an adverse action." *O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004). The Seventh Circuit recognizes three categories of cases where a requisite act of discrimination exists. *Nichols v. Southern Ill. Uni.-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007). First, cases where an employee's compensation or other financial terms of employment are diminished. *Id.* Also, cases in which a lateral transfer, without a change of financial terms, reduces the employee's career prospects by allowing her skills to atrophy. *Id.* Finally, cases in which the employee is not moved to a different job, but the conditions under which she works are changed in a way that subjects her to humiliating, degrading, unsafe, unhealthy, or otherwise significantly negative alteration in the workplace environment. *Id.*

Pubentz argues that Salazar failed to give her a positive performance review following the work she performed in two terrorism cases in 2007. Pubentz also contends that her removal from her relief supervisor position on October 14, 2008 was a materially adverse employment action. The Defendants challenge Pubentz's two assertions on the grounds that she did not timely file an EEOC charge concerning the 2007 and 2008 employment actions. *See* 42 U.S.C. § 2000e–5 (e)(1); *Stepney v. Naperville Sch. Dist.*, 392 F.3d 236, 239 (7th Cir. 2004). A federal employee who believes that they have been discriminated against on the basis of national origin must contact a counselor within 45 days of the alleged discriminatory act. 29 C.F.R. § 1614.105. Failure to do so bars federal employees from pursuing a Title VII action against the government. *Smith v. Potter*, 445 F.3d 1000, 1007 (7th Cir. 2006). In determining when such an action accrues, the "proper focus is upon the time of the discriminatory acts, not upon the time at which the consequence of the acts becomes most painful." *Del. State Coll. v. Ricks*, 449 U.S. 250, 258 (1980) (citing *Abramson v. University of Hawaii*, 594 F.2d 202, 209 (9th Cir. 1979)). A time barred discriminatory act is not actionable, even if it is related to acts alleged in timely filed charges. *National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 113 (7th Cir. 2002).

In this case, Pubentz first made contact with an EEO counselor on April 10, 2009. Therefore for the purpose of Pubentz's discrimination claim, any discrete acts

perpetrated before February 24, 2009 cannot provide a cognizable basis for her discrimination claim. Pubentz's claims concerning Salazar's lack of recognition of Pubentz's work performance in 2007 and Pubentz's removal from her relief supervisory position on October 14, 2008 are both time barred.

Next, Pubentz claims that Carlin's description of her as a "Zionist Arab" constitutes an adverse employment action. Pubentz has not linked Carlin's term to an adverse employment action she suffered. Carlin's comment was said outside the presence of Pubentz and was voiced in a private meeting between Carlin and England. The record does not show that Carlin had a supervisory role or had the power to make employment decisions concerning Pubentz. Although England, Pubentz's supervisor, was present during the meeting the evidence clearly establishes that England did not utter a comment concerning Pubentz's national origin. In the absence of evidence showing a negative alteration in Pubentz's workplace environment or a change in the conditions of her position, Pubentz has failed to show that Carlin's comment was an adverse employment action.

Third, Pubentz contends that the Defendants discriminated against her when she was not given a promotion. Pubentz's lack of promotion claims encompass two actions. First, Salazar and England not recommending Pubentz for a supervisory position. Second, Pubentz's failure to be granted a pay grade increase to a GS-13 pay scale.

Pubentz must establish that the Defendants granted a promotion to someone outside of her protected group who was not better qualified than her. *Grayson v. City of Chicago*, 317 F.3d 745, 748 (7th Cir. 2003).

Although Pubentz desired to be reinstated in a supervisory position, Pubentz's record did not meet the criteria for a supervisory role. The record indicates that supervisory positions require specific performance criteria which must be met. Pubentz's "minimally successful" rating from her August 2008 review prohibited her from meeting the performance levels required of a supervisory position. With these requirements in mind neither Salazar nor England recommended Pubentz for a supervisory position. Additionally, Pubentz remained in her position as an analyst after speaking to Salazar and England about supervisory positions. Since Pubentz's position did not change and her workplace was not significantly altered the Court does not find that she suffered an adverse employment action.

Pubentz asserts that the Defendants failure to promote her with a pay grade increase constitutes an adverse employment action. Pubentz seeks to draw a tenuous link between the denial of pay grade increase and a hypothetical promotion that she never applied for. *Gaines v. White River Envtl. P'ship*, 66 Fed. Appx. 37, 39 (7th Cir. 2003) (holding that a plaintiff must establish that they applied for a promotion to sufficiently establish an adverse action); *See Grayson,* 317 F.3d at 748-49; *Freeman*

*v. Lewis*, 675 F.2d 398, 401 (D.C. Cir. 1982) (holding that when considering a failure to promote, the plaintiff must show that she applied for and was rejected from the position, to prove an adverse action).  Because Pubentz never applied for the pay grade increase and the conditions of her position were not changed, her mere inquiry concerning her viability for a promotion cannot serve as grounds for a Title VII discrimination claim.

Fourth, Pubentz argues that ASAC Marrone's unwillingness to discuss her workplace complaints and her intention to file an EEOC charge was a materially adverse employment action.  The record indicates that Marrone asked Pubentz to leave his office because he did not feel comfortable discussing a potential EEOC charge.  The trivial contention that a supervisor's unwillingness to discuss workplace issues, without more, constitutes an adverse action is not persuasive.  No evidence has been elicited indicating that Marrone's refusal to discuss the matters prejudiced Pubentz's position in anyway.

Pubentz claims that the denial of training opportunities was an adverse employment action.  In some cases "[a] discriminatory denial of job related training can constitute an adverse employment action under Title VII."  *Durkin v. City of Chicago*, 341 F.3d 606, 611 (7th Cir. 2003).  Pubentz claims that her denial of training inhibited her ability to grow professionally.  The record shows that Pubentz participated in over

fifteen classroom and computer based training courses from the time she began at the FBI until her tenure in Chicago ended in 2009. Over half of those training courses occurred in the time period of 2008 to 2009. The record also indicates that on two occasions Pubentz was interested in attending training courses which were not open to linguists. Pubentz does not allege that she was denied training opportunities which were opened to all linguists, the record shows that she was only denied training which she was not eligible to participate in. Pubentz's exposure to training, related to her field of employment, was robust and she was allowed to participate in a broad array of training programs. The limited training opportunities that were denied to Pubentz are not substantial enough to constitute an adverse employment action.

The Court finds that Pubentz has not suffered a materially adverse employment action.

### 2. Similarly Situated Individuals

Even if we were to assume that Pubentz had sufficiently established that she had suffered an adverse employment action, she nevertheless fails to identify a similarly situated employee to render an adequate comparison. To determine if employees are similarly situated the Court must find that there are "sufficient commonalities on key variables between the plaintiff and the would be-comparator to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury

to reach an inference of discrimination." *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007). Comparators must have "engaged in similar-not identical-conduct to qualify as similarly situated." *Perick v. Indiana Univ.- Purdue Univ. Indianapolis*, 510 F.3d 681, 691 (7th Cir. 2007). "If an employer takes an action against one employee in a protected class but not another outside that class, one can infer discrimination." *Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012). The relevant inquiry focuses on whether the employer subjected two different classes of employees differently. *Id.* "[W]hen uneven discipline is the basis for a claim of discrimination, the most relevant similarities are those between the employees' alleged misconduct, performance standards, and disciplining supervisor," rather than the job description of cited employees. *Rodgers v. White*, 657 F.3d 511, 518 (7th Cir. 2011).

Pubentz has provided the names and titles of five linguists that she asserts were treated more favorably than her. Pubentz has not provided sufficient information concerning Nabil Mikhail ("Mikhail") and Pierre Kattar ("Kattar") to render an adequate comparison. The only evidence provided for Mikhail and Kattar shows that both FBI employees were linguists and both were promoted to the GS-13 pay scale after submitting an application for promotion. The record does not indicate which FBI Office the linguists worked for, which supervisor oversaw their promotion, or their relevant performance evaluation. In the absence of sufficient information concerning Mikhail

and Kattar, the Court focuses its analysis on the three other FBI linguists located in the Chicago FBI Office. Pubentz submits that FBI linguists Steven Youkhana ("Youkhana"), Erastus Musyoka ("Musyoka") and Ewa Plojaz ("Plojaz") are similarly situated employees, are not in Pubentz's protected class, and were treated more favorably than her. Although the three linguists are all Language Analysts, like Pubentz, within the Chicago FBI Office, the comparison ends there.

First, the record reveals that none of the employees were subject to the same type of employment decision. All three linguists submitted GS-13 promotion packages between 2008 and 2011, but only Youkhana and Plojaz were actually promoted to the GS-13 grade. The record indicates that both linguists who were granted a pay grade increase had outstanding performance ratings (the highest of five possible levels). As previously noted Pubentz never submitted a GS-13 package and had significantly lower performance reviews, leaving an inadequate basis to make a meaningful comparison of the employment decisions. Other than the three linguists GS-13 applications for pay grade increase, the record does not show that any of the linguists were granted or engaged in any conduct which would serve as a basis to support Pubentz's other claims of disparate treatment.

Second, Pubentz has not established that the employees were under the direction of the same supervisor. *Little v. Ill. Dep't. of Revenue*, 369 F.3d 1007, 1012 (7th Cir.

2004) ("A similarly-situated employee must have been disciplined, or not, by the same decision maker who imposed an adverse employment action on the plaintiff."). Karissa Calvo and Jeanne White ("White") were the two linguists' supervisors who respectively oversaw the promotion of Youkhana and Plojaz. Although Pubentz identified White as a supervisory agent in her EEO case, the record indicates that White never directly supervised Pubentz or was involved in any disciplinary or promotional decision concerning Pubentz. The record does not show that either of the promoted linguists were directly supervised by Salazar or England, the two supervisors who directly supervised Pubentz and allegedly denied her promotional opportunities. England did realize that Youkhana and Plojaz were granted the GS-13 pay grade increase, however she was not directly responsible for the submission of their promotional packages. Not only has Pubentz failed to show that the employment actions are comparable, she does not show that the comparator employees were subject to the same supervisors' discretion.

Pubentz has not met her burden of showing that she suffered a materially adverse employment action or that other similarly situated individuals received more favorable treatment in the Chicago FBI Office. Because Pubentz has not established a prima facie case for discrimination, it is unnecessary for us to reach the issue of pretext.

Defendants' summary judgment motion as to Pubentz's disparate treatment claims discussed in this section is granted.

## B. Hostile Work Environment Resulting in Discrimination

Pubentz also contends that she was subjected to a pattern of harassing conduct that constituted a hostile work environment. The conduct which Pubentz alleges formed a hostile work environment is broad and spans from her tenure in Chicago through her time in San Francisco. Title VII prohibits employers from permitting a work environment that is hostile to employees because of their inclusion in a protected class, such as national origin. *See Cerros v. Steel Tech., Inc.*, 288 F.3d 1040, 1045 (7th Cir. 2002); *Shanoff v. Ill. Dep't of Human Servs.*, 258 F.3d 696, 701 (7th Cir. 2001). To establish a hostile work environment claim based on national origin, Pubentz must establish that: 1) her work environment was both objectively and subjectively offensive; 2) the harassment was based on her national origin; 3) the conduct was either severe or pervasive; and 4) there is a basis for employer liability. *See Dear v. Shinseki*, 578 F.3d 605, 611 (7th Cir. 2009). The parties dispute whether the conduct of the Defendants was based on Pubentz's national origin and whether she was subjected to severe or pervasive harassment. Each contested element will be resolved in turn.

### 1. Harassment Based on National Origin

Under Title VII, harassment must be based on the plaintiff's protected status. *See e.g. Hardin v. S.C. Johnson & Sons, Inc.*, 167 F.3d 340, 345 (7th Cir. 1999). Although

Pubentz need not show that the conduct against her was explicitly motivated by her national origin, the conduct must have a racial character or purpose to support a hostile work environment claim. *See Luckie v. Ameritech Corp.*, 389 F.3d 708, 713 (7th Cir. 2004). Pubentz claims that she endured a hostile work environment in Chicago which is evidenced by 1) Salazar's failure to acknowledge Pubentz's work and her removal from the supervisory position she held; 2) Carlin calling Pubentz a "Zionist Arab" after the speaker event; 3) Salazar and England refusing to recommend Pubentz for a supervisory position, on two occasions; 4) ASAC Marrone's unwillingness to discuss Pubentz's workplace complaints; and 5) the refusal to allow Pubentz to participate in training opportunities on multiple different occasions. Additionally, Pubentz claims that she was also subjected to a hostile work environment in San Francisco where her supervisor 6) did not recommend her for two supervisory positions; 7) refused to allow her to attend training; and 8) failed to give her enough work assignments and placed her on a PIP.

### A. Environment in Chicago

As previously noted, Pubentz's removal from her supervisory position and Salazar's failure to acknowledge her work were not timely filed and therefore not considered for the purpose of her Title VII disparate treatment claim. Pubentz correctly points out that for the purposes of establishing her hostile work environment claim the Court should consider these events. *See National*, 536 U.S. at 122 ("A charge alleging

a hostile work environment claim will not be time barred so long as all acts which constitute the claims are part of the same unlawful employment practice and at least one act falls within he time period."). Pubentz consistently references an award she received for the work she performed on the 2007 terrorism cases. Pubentz elicits this award to show the distinction between her negative performance review and the quality of her work which merited an accommodation. However, the award indicates that Pubentz excels in the quality of her work product but potentially lacks in other important areas of work performance, such as professionalism and following protocol. Pubentz has not provided any evidence indicating the actions were taken because of her national origin.

Pubentz claims the term "Zionist Arab," which Carlin used to describe her to England, created a hostile work environment. The term specifically focused on Pubentz's beliefs and national origin. The Court finds that the term "Zionist Arab" is sufficiently tied with Pubentz's national origin to constitute harassment based on Pubentz's protected class.

Pubentz asserts that the denial of multiple training opportunities contributed to the hostile work environment. The record indicates that Pubentz was denied the ability to participate in the training opportunities because the training programs were not open to linguists and therefore she was not eligible. Pubentz has not provided any evidence

that suggests the denials were because of her national origin. This conduct therefore cannot act as a premise for a hostile work environment claim.

Pubentz argues that ASAC Marrone's unwillingness to discuss her workplace complaints and her intention to file an EEOC charge was harassment because of her national origin. The record lacks any indication that ASAC Marrone was motivated by discriminatory intent in excusing Pubentz from his office after she made her intentions clear concerning filing an EEOC charge. The evidence shows that ASAC Marrone felt uncomfortable about discussing the matter with Pubentz and determined that the discussions would be inappropriate. Pubentz submits no evidence creating a material dispute of fact as to Marrone's motive for declining to discuss Pubentz's EEOC charge with her.

Pubentz contends that she was denied promotional opportunities because of her national origin. Contrary to Pubentz's contention, the record indicates that Pubentz never applied for the pay scale promotion and a promotion to a supervisory position was foreclosed by her "minimally successful" rating in the category of professionalism. Pubentz's failure to apply and her performance record served as the bars to her promotion. The record is absent any indication that her national origin played even the slightest role in her inability to get promoted. Pubentz has failed to establish that she was denied promotions due to her national origin.

## B. Environment San Francisco

Pubentz renews her claim that she was denied promotional opportunities because of her national origin in San Francisco. As in Chicago, Pubentz has not produced any evidence indicating that Reilly denied her promotions because of her national origin. The record indicates that Pubentz sought out Reilly's recommendation for a promotion on two different occasions. On both occasions Reilly did not recommend her. Reilly's decision not to recommend Pubentz was based on his limited interactions with her in the first instance and his feeling that she was unqualified for a supervisory position on the second occasion. The record is absent any indication that her national origin played even the slightest role in Reilly's decision. Pubentz has failed to establish that she was denied promotions due to her national origin.

Pubentz asserts that Reilly's denial of her two training requests was part of and contributed to a hostile work environment. The record indicates that the training opportunities we not opened to Language Analysts, therefore Pubentz was not eligible for the training. Pubentz has failed to establish that she was denied training opportunities due to her national origin.

Finally, Pubentz claims that Reilly failed to give her enough work assignments during the period of March thru June of 2010. Additionally Pubentz claims that her placement on a PIP was part of a hostile work environment. Again, Pubentz has not included any evidence that the Defendants actions were motived by her national origin.

The Court finds that within the confines of the vast array of workplace complaints and grievances Pubentz elicits, only Carlin's comment labeling Pubentz a "Zionist Arab" could serve as the basis of a hostile work environment claim. Pubentz has failed to adduce evidence that the remaining incidents were on account of her national origin. *See Hildebrandt v. Ill. Dept. of Natural Res.*, 347 F.3d 1014, 1035 (7th Cir. 2003) (reiterating the requirement of demonstrating that harassment occurred because of the plaintiff's inclusion in a protected class). The Court must now determine if Carlin's "Zionist Arab" comment was sufficiently severe or pervasive to meet the requirements of a prima facie hostile work environment claim.

## 2. Conduct Either Severe or Pervasive

In establishing that the alleged harassment was sufficiently severe or pervasive to alter the conditions of a plaintiff's employment, the plaintiff "must show that her work environment was both subjectively and objectively offensive; 'one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'" *Gentry v. Export Packaging Co.*, 238 F.3d 842, 850 (7th Cir. 2001) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787(1998)). Courts examine a variety of factors when evaluating whether a workplace is hostile, including the frequency of the discriminatory conduct, its severity, whether the conduct is physically threatening, humiliating or a mere offensive utterance, and whether it unreasonably interferes with an employee's job performance. *Andonissamy v. Hewlett-Packard Co.*,

547 F.3d 841, 847 (7th Cir. 2008). The Seventh Circuit has noted that offensive statements made outside of the plaintiff's presence, even if accompanied by "a few [offensive] statements made directly to h[er]," do not constitute "harassment [that is] so severe or pervasive that it alters the conditions of the plaintiff's employment." *Thompson v. Mem. Hosp. of Carbondale*, 625 F.3d 394, 401 (7th Cir. 2010). "Title VII . . . will not find liability based on the 'sporadic use of abusive language." *Ford v. Minteq Shapes & Servs, Inc.*, 587 F.3d 845, 848 (7th Cir. 2009) (quoting *Faragher*, 524 U.S. at 788).

Pubentz contends that Carlin's comment to England, calling her a "Zionist Arab" was sufficiently severe. In determining the severity of the comment the Court cannot divorce the alleged harassment from the context in which it occurred. *See Hilt-Dyson*, 282 F.3d at 464. The evidence shows that Pubentz and Carlin had worked together for more than five years and Carlin considered Pubentz a friend. Carlin made this statement to England following the Palestinian Speaker Event to explain Pubentz's aggressive viewpoints during the FBI presentation. Carlin's comment was made during the course of a private conversation between England and himself. Carlin was seeking to explain why the confrontation between Pubentz and the speaker "got heated and why it got a little out of hand." The record indicates that Carlin was describing why Pubentz may be biased on the Gaza Strip issue, which was described as unrepresentative of Arabs in the region. Carlin's comment, made outside the presence of Pubentz, on first

glance may appear crass.  When viewed in the context in which the comment was said, however, it is not sufficiently severe or pervasive to support a hostile work environment claim.  *See Ngeunjuntr v. Metro. Life Ins. Co.*,146 F.3d 464, 467 (7th Cir. 1998).

The Court finds that Pubentz has not provided evidence of harassment which was sufficiently severe or pervasive to satisfy the requirements for a hostile work environment claim.  We conclude that a reasonable jury could not find that Pubentz endured a hostile work environment sufficient to establish a Title VII discrimination claim.  Accordingly, the Defendants's motion for summary judgment is granted.

## II. Retaliation (Count II)

Pubentz alleges that she was retaliated against after filing her initial EEOC charge in Chicago in April 2009.  Pubentz's amended complaint states two retaliation claims; one concerning retaliation in the Chicago FBI Office, the other concerning retaliation in the San Francisco FBI Office.  For the purposes of resolving the first retaliation claim the Court considers all conduct occurring in Chicago.

The anti-retaliation provision of Title VII prohibits an employer from taking an adverse employment action against an employee because she has filed an employment discrimination charge.  *See* 42 U.S.C. § 2000e-3(a); *Burlington N. & Santa Fe R.R. Co. v. White*, 548 U.S. 53, 62 (2006).  As with discrimination claims under Title VII, retaliation may be proven through either the direct or indirect method.  *See Weber v.*

*Univs. Research Ass'n, Inc.,* 621 F.3d 589, 592 (7th Cir. 2010). Pubentz argues that her retaliation claim can be established under the direct and indirect methods.

Proving retaliation through the direct method requires Pubentz to establish that 1) she engaged in protected conduct; 2) that she suffered an adverse employment action; and 3) there is a causal connection between the two. *Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 673 (7th Cir. 2011). Under the indirect method, Pubentz must establish a prima facie case of retaliation by showing that: 1) she engaged in a statutorily protected activity; 2) she met the employer's legitimate expectations; 3) she suffered a materially adverse employment action; and 4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 666 (7th Cir. 2006). If Pubentz satisfies these elements the burden shifts to the Defendants to produce a legitimate, non-retaliatory reason for its actions. *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009)*; Nichols*, 510 F.3d at 785. If the Defendants do this, the burden shifts back to the Pubentz, who must show that the Defendants' stated reason is a pretext to a discriminatory motive. *Id*. The parties contest whether Pubentz suffered an adverse employment action to sufficiently support her retaliation claim.

**1. Direct Method**

The standard for what constitutes an adverse employment action is more flexible in a retaliation claim than in a discrimination claim. *Burlington* , 548 U.S. at 69; *Lewis*

*v. City of Chi. Police Dept.*, 590 F.3d 427, 437 (7th Cir. 2009). In the context of a retaliation claim, adverse employment actions are not limited to actions that affect the terms and conditions of employment. *Burlington,* 548 U.S. at 69. Instead, courts evaluate retaliation claims using an objective standard. *Id.* Therefore retaliatory conduct is actionable if the "challenged actions are ones that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity." *Burlington* , 548 U.S. at 67; *Henry v. Milwaukee Cty.*, 539 F.3d 573, 586 (7th Cir. 2008). The language "materially adverse" separates "significant from trivial harms" and clarifies that adverse employment actions do not encompass "those petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington*, 548 U.S. at 68.

Pubentz seems to contend that all allegations of workplace misconduct stretching back to 2007 should be considered for the purposes of proving the adverse employment action requirement of her retaliation claim. Pubentz interprets the inclusive adverse employment action requirement under a Title VII retaliation claim too broadly. To sustain a retaliation claim Pubentz must have engaged in some protected activity, prior to an employers adverse actions taken in retaliation for exercising her right to engage in protected activity. *See Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1122 (7th Cir. 2009) (employer must have actual knowledge of the protected activity in order for its decisions to be retaliatory).

The evidence shows that Pubentz informed England that she was contemplating filing an EEOC charge on October 24, 2008. The basis for Pubentz's consideration of an EEOC charge was her removal from her relief supervisor position on October 14, 2008, by Salazar. Pubentz did not indicate to England that Salazar had engaged in any discriminatory conduct. The only issues raised were personal grievances. It cannot be assumed that England is clairvoyant about Pubentz's motivations so as to put her on notice of Pubentz's subjective feelings of discrimination. In the absence of any contact with an EEO counselor, filing a formalized grievance, or disclosing a discriminatory motive to her supervisor, Pubentz's actions do not constitute an opposition to an unlawful employment practice for the purposes of engaging in a protected activity for a Title VII retaliation claim. *See Tomavich*, 457 F.3d at 663-664 ("Although filing an official complaint with an employer may constitute statutorily protected activity under Title VII, the complaint must indicate the discrimination occurred because of . . . national origin or some other protected class."). Likewise Pubentz does not elicit any evidence that England deterred her from filing her EEOC charge, six months following Pubentz and England's meeting. Pubentz first made contact with an EEO counselor on April 10, 2009, and told ASAC Marrone on April 22, 2009 about her intentions to file an EEOC charge based on discrimination she was enduring because of her national origin. Ultimately Pubentz submitted her formal EEOC charge on May, 8, 2009. Therefore for the purposes of Pubentz's first retaliation count, only incidents which

occurred on or after April 22, 2009, when she provided notice to ASAC Marrone of her feelings of enduring discrimination, can be used as support for her retaliation claim. *Id.*

During Pubentz's April 22, 2009 meeting with ASAC Marrone she discussed her workplace problems. While discussing these issues Pubentz told Marrone that she intended to file an EEOC charge concerning Carlin's characterization of her as being a "Zionist Arab." After Pubentz told Marrone her intentions, he refused to discuss her other concerns and requested she leave his office.

Pubentz alleges that Marrone's unwillingness to discuss her work related issues and the subsequent expulsion from his office constitutes a sufficiently adverse employment action from the purposes of a retaliation claim. As previously discussed, Marrone dismissed Pubentz from his office because he felt that proceeding would be inappropriate after Pubentz mentioned her intention to file an EEOC charge. Although a materially adverse action under Title VII's anti-retaliation provision encompasses more activity than the adverse employment action required to establish a discrimination claim, the Court does not find that Pubentz's isolated encounter with Marrone constitutes a materially adverse action. *See Porter v. City of Chicago*, 700 F.3d 944, 957 (7th Cir. 2012). Under the circumstances, Pubentz did not suffer any adverse consequence from the abrupt end to the meeting. Pubentz only suffered a loss of conversation with her supervisor about her workplace concerns and was not dissuaded from filing her Title VII charge. The Court does not find that Marrone's conduct would

deter a reasonable employee from filing an EEOC charge. Ultimately Pubentz filed an EEOC charge on May 8, 2009, after the meeting with ASAC Marrone. Pubentz's failure to provide evidence that she suffered a materially adverse employment action is fatal to her retaliation claim under the direct method.

### 2. Indirect Method

Pubentz has not established that she suffered an adverse employment action after the initiation of the EEOC action. Because both the direct and indirect methods for proving a retaliation claim require proof of an adverse employment action, the Court finds that a Title VII retaliation claim cannot be established through the indirect method.

Moreover, assuming that Pubentz had established that she endured a materially adverse employment action, Pubentz has not provided a similarly situated employee who was treated more favorably than her, as required for proving a retaliation claim under the indirect method. Pubentz has not demonstrated that she can sustain a retaliation claim under the indirect method. The Defendants's motion for summary judgment is granted.

### III. Continuing Retaliation (Count III)

Pubentz claims that she endured continuing retaliation after her move to San Francisco, California. Pubentz alleges that the retaliation in the San Francisco FBI Office stemmed from the filing of her first EEOC charge in Chicago. This retaliation

prompted Pubentz to file a second EEOC charge in San Francisco on September 17, 2010. The record lacks any evidence pointing directly to explicit retaliation against Pubentz, such as an admission of retaliation. *See Koszola v. Bd. of Educ. of Chi.*, 385 F.3d 1104, 1109 (7th Cir. 2004); *Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 593 (7th Cir. 2008). Additionally, Pubentz utilizes the indirect method framework in advocating for her position that she has successfully met the requirements of a prima facie retaliation case. Accordingly, the Court will evaluate whether Pubentz can prove discrimination under the indirect method.

Pubentz contends that after her move to San Francisco, 1) England contacted Reilly and called Pubentz "high maintenance" because she filed an EEOC charge in Chicago and San Francisco Foreign Language Program Manager ("FLPM") Jolanta McGovern ("McGovern") told Reilly that he would have his hands full with Pubentz; 2) Reilly denied her request to be promoted to a relief supervisor position on two occasions; 3) Reilly denied Pubentz the opportunity to participate in multiple certification and development courses; 4) she was removed from her work assignments and Reilly placed her on a PIP after she contacted an EEO counselor in San Francisco; and 5) unreasonable assignment deadlines were given to her in June 2010 and in September 2010 Pubentz did not have any work to perform. Pubentz's second retaliation claim is distinct from the first Chicago retaliation claim because she alleges

that the retaliation was carried out by Reilly in San Francisco.  The parties dispute the third and forth elements of the indirect method analysis-whether Pubentz suffered an adverse employment action and whether Pubentz has provided sufficiently similarly employees to render a meaningful comparison.

### 1. Adverse Employment Action

Pubentz contends that she suffered multiple adverse employment actions in San Francisco as a result of filing her EEOC charge in Chicago and her second EEOC charge in San Francisco.  The Defendants argue that Pubentz has failed to establish she suffered an adverse employment action because Pubentz's allegations are common workplace annoyances that do not rise to the level of an adverse employment action. The Supreme Court has emphasized that "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work." *Burlington*, 548 U.S. at 68.  Title VII's anti-retaliation provision prohibits only those employer actions that are likely to deter victims of discrimination from invoking the Act's remedial mechanism. *Id.*  The Court agrees with the Defendants' assertion  that the majority of the conduct Pubentz alleges are not severe enough to constitute an adverse employment action.

Pubentz alleges that England contacted her new supervisor in San Francisco, Reilly, and told him that Pubentz was "high maintenance" and an unreliable employee.

Pubentz also asserts that FLPM McGovern told Reilly that he was going to have his hands full with her. Pubentz contends that England's and FLPM McGovern's negative comments stemmed from Pubentz's filing of her EEOC charge in Chicago. The record does not support Pubentz's contention. The record shows that Reilly admitted to speaking with England, after Pubentz came to San Franciso, about issues exclusively related to work and never concerning Pubentz and the filing of an EEOC charge. Reilly acknowledges that he deems Pubentz as a "high maintenance" employee because of the amount of time she demands of him in order to complete assignments and function in the office. FLPM McGovern's comment stating Reilly would have his hands full is petty and the record reveals that the statement did not have anything to do with Pubentz's EEOC complaint, which Reilly did not know if McGovern was aware of. The mundane label of high maintenance and a comment about Reilly having his hands full fits comfortably into the classification of a petty slight and does not rise to the level of an adverse action.

Pubentz also complains that the San Francisco supervisors did not recommend her for a promotion in retaliation for her filing a Title VII claim. Pubentz cites numerous instances when she either inquired about the possibility of a promotion or applied for a promotion and it was not granted. None of the instances suggest that Reilly purposefully discouraged Pubentz from submitting an application.

Pubentz first asserts that when she initially arrived in San Francisco in August 2009, she asked Reilly if he would recommend her for a promotion. Reilly told her that he did not know her well enough to offer the recommendation. Subsequently in September 2010, Pubentz again sought out Reilly for a recommendation to act as a fill in supervisor when Reilly was absent. Reilly informed Pubentz that she was welcomed to submit an application but that she should not expect his endorsement. Pubentz applied for the position and was not hired into the supervisory position. Reilly alleges that he did not recommend Pubentz for the position because he determined that she had not exercised sound judgment in a leadership role. Pubentz asserts that Reilly's lack of recommendation stemmed from his observation of her personnel file in Chicago and his knowledge of Pubentz's Title VII complaint. Viewing the evidence in the light most favorable to Pubentz, as we must, the Court finds that Reilly's denial of a recommendation concerning a position Pubentz had applied for, is substantial enough to dissuade a reasonable person from utilizing Title VII and is therefore an adverse employment action.

Pubentz's denial of training opportunities is not severe enough to constitute an adverse employment action. Reilly notes that FBI Language Services Policy in San Francisco prohibits linguists from attending training that does not directly relate to a linguist's duties, because of under staffing. Pubentz applied to participate in eight

different training programs, including an Instructor Development Course and a Computer Forensic Training Program. Reilly denied Pubentz's request to partake in the training because they were not related to her position as a Language Analyst. The lack of relation to the skills she needed as a linguist and the large amount of backlogged work that Hebrew linguists experienced led to her denial of attending training activities. Because the training was not related to the performance of her position, Pubentz cannot establish that she suffered an adverse employment action. The conduct Pubentz alleges would not dissuade a reasonable person from filing an EEOC charge. *See id.*

Pubentz alleges that within two months of contacting an EEO counselor in San Francisco, Reilly placed her on a PIP. After beginning on a complex translation assignment Pubentz was abruptly removed from the assignment. Subsequently on June 7, 2010, Reilly informed Pubentz that he was placing her on a PIP for a term of 90 days. Ordinarily, "[a] transfer involving no reduction in pay and no more than a minor change in working conditions" does not rise to the level of a materially adverse employment action. *Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996). In this case, the PIP work program curtailed Pubentz's freedom to personally manage her work assignments and involved a heightened level of scrutiny on her work by her supervisors. This reduction in work place independence is substantial enough to dissuade a

reasonable person from utilizing Title VII and is therefore an adverse employment action.

Finally, Pubentz elicits two incidents where she alleges that her work assignments were too onerous in one instance and not substantial enough in the next. Pubentz claims that in June 2010 she was given unreasonable assignment deadlines. Subsequently Pubentz claims that in September 2010 she did not have any work to perform. Pubentz's reliance on both workload incidents to fortify her retaliation claim is misplaced. The ebbs and flows of the amount of work an employee is responsible for is a common annoyance repeated thousands of times over in work places throughout the country. Concerning Pubentz's June 2010 work overload, the record indicates that the FBI had a tremendous backlog of Hebrew related translation work not related to the performance of Pubentz. The June 2010 assignment deadlines were put in place based on the operational needs of the department. Furthermore the record shows that Reilly commonly extended deadlines if needed. Similarly the September 2010 lull in work was a result of the San Francisco FBI Offices's operational concerns and Pubentz returning to normal duties after coming off her PIP. The varying amount of work that Pubentz experienced would not deter a potential victim of discrimination from utilizing Title VII's remedial mechanisms and is therefore not an adverse employment action.

The Court finds that the only adverse employment actions Pubentz suffered was Reilly not recommending her for a position she had applied for and her removal from her assignment and placement on the PIP in June 2010.

## 2. Similarly Situated

Pubentz argues that she has provided a similarly situated employee which offers a sufficient comparison to prove her retaliation claim.[6]   To sustain her claim, Pubentz is required to point to similarly situated employees who did not participate in a Title VII action who were treated more favorably.  *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 939 (7th Cir. 2007).  The only reference to an employee in the San Francisco FBI Office is in Reilly's deposition when he briefly mentions a female employee that he recommended for a supervisory position.  The record does not show what position the employee held, what her qualifications for the position where, and if Reilly's recommendation ultimately resulted in her promotion, or if it was just a positive factor in an already qualified application.  In the absence of sufficient information concerning the San Francisco employee, the Court looks to the only other employees provided by Pubentz.

---

[6]Pubentz submits the findings of an EEOC Administrative Law Judge ("ALJ") concerning a San Francisco linguist who was found to have been discriminated against based on her disability. Pubentz has not asserted the relevance of the findings. The Court can only guess that the inclusion of the material is for the purpose of establishing a similarly situated employee or a pattern of conduct performed by the supervisors in San Francisco. However the claims determined by the ALJ are distinct from Pubentz's claims and does not establish that Pubentz was treated less favorably. The Court does not find the evidence relevant to Pubentz's claims.

Pubentz gives the names and position titles of five employees who were allegedly treated more favorably than Pubentz. As previously discussed, the record only includes sufficient information concerning three FBI linguists to provide an adequate comparison. Pubentz claims she was retaliated against after she moved to San Francisco by Reilly. The three linguists that Pubentz provides are all located in the Chicago FBI Office. Pubentz's reliance on the three FBI linguists in Chicago to support her prima facie case is misplaced. Further, nothing in the record suggests that Reilly was involved in any decision from which Pubentz seeks to draw a comparison. The evidence also indicates that Special Agent David Miller ("Miller") and Supervisory Special Agent ("SSA") Enrique Alvarez ("Alvarez"), who were involved in the complex national security translation assignment, and pressed for Pubentz's removal from the assignment, did not know about Pubentz's Chicago EEOC charge and further had no power to make employment decisions for linguists in Chicago.

Under Title VII, a "decisionmaker is the person responsible for the contested decision." *Rogers,* 320 F.3d at 754. The record does not show that Reilly had anything to do with the employment decisions made by the Chicago FBI Office concerning the three provided FBI linguists. Without Reilly's participation in the Chicago FBI hiring and promotional decisions Pubentz cannot prove that similar employees were treated more favorably by the same decision maker. *Coleman,* 667 F.3d at 848. In sum,

Pubentz has not met her burden of showing that other similarly situated individuals received more favorable treatment in San Francisco. Pubentz has not established a prima facie case for retaliation.

### 3. Reason for Actions

Even if we were to assume that Pubentz had sufficiently established a prima facie retaliation claim, for Reilly's denial of a recommendation and her placement on the PIP, Pubentz has failed to provide evidence indicating that the reasons provided by the Defendants were merely pretext for their retaliatory motive. The Defendants have provided ample evidence supporting the reason why Reilly did not recommend Pubentz for the supervisory position in September 2010 and the reason why Pubentz was removed from her work assignment and placed her on the PIP.

### a. Reilly's September 2010 Denial of Recommendation

The evidence indicates that Reilly's decision to forgo recommending Pubentz for a supervisory position was based on his interactions with her over the course of her time in San Francisco. Reilly provides numerous examples of Pubentz's conduct which he deemed as unsuitable of an individual seeking a leadership position. Reilly mentions 1) Pubentz not arriving for her first scheduled day, causing her to miss prearranged appointments; 2) Pubentz acting in a confrontational manner when she locked herself out of her office and could not reach Reilly to be let back in to her office; 3) Pubentz's

repeated attempts to apply for training that was not related to her position as a Language Analyst; and 4) Pubentz's repeated attempts to move her lunch period to the end of the day, against FBI policy and Reilly's warnings. Pubentz has not submitted any evidence indicating that Reilly's denial of a recommendation for Pubentz's promotion was merely a pretext for retaliation.

### b. Placement of the PIP

In late 2009 Pubentz was assigned to translate recordings of wire intercepts in a complex national security investigation. Pubentz was tasked with providing SA Miller with the identity of the individuals and the subject matter of the recordings. In early 2010 SA Miller became concerned with the low amount of translated materials Pubentz had submitted to him. SA Miller spoke with his supervisor SSA Alvarez, about the lack of progress and SSA Alvarez instructed SA Miller to determine the extent of the work Pubentz had completed. After looking into the reason for Pubentz's low productivity, it was discovered that Pubentz had not reviewed approximately 614 recordings and of the approximately 888 recordings she had reviewed she had not transcribed a single recording. SA Miller met with Pubentz to discuss the lack of progress on the assignment. During the meeting Pubentz became argumentative and asserted that she would provide the materials that she deemed pertinent. Pubentz's job was to translate the materials that were assigned to her. It was not Pubentz's responsibility to

unilaterally make relevance determinations on assignments which she did not know the scope of the investigation. SA Miller relayed the happenings of the meeting to SSA Alvarez, who subsequently met with FMLA McGovern. Based on Pubentz's lack of progress on the assignment the entire case was reassigned.

On June 7, 2010, Reilly informed Pubentz that she was being placed on PIP for 90 days to assist her productivity at work. The Defendants have produced evidence indicating that Pubentz was placed on the PIP because of her failure to translate the materials that had been assigned to her. Pubentz has not submitted any evidence indicating that her placement on the PIP was merely a pretext for retaliation. The Court finds that Pubentz has not provided sufficient evidence to establish a prima facie case for retaliation or shown that the Defendants's actions were merely a pretext for retaliation. Accordingly, the Defendants' motion for summary judgment is granted.

## IV. First Amendment Retaliation (Count IV)

Pubentz alleges that the Defendants retaliated against her for expressing her First Amendment rights after her interaction with a guest Palestinian speaker at a 2009 FBI presentation. The First Amendment of the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. Amend. I. However, when a citizen is employed by the government, the citizen must accept certain limitations of their freedoms. *Waters v. Churchill*, 511 U.S. 661, 671 (1994);

*Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U.S. 563 (1968). To succeed on a First Amendment retaliation claim, a plaintiff must show that: "1) h[er] speech was constitutionally protected; 2) [s]he has suffered a deprivation likely to deter free speech; and 3) h[er] speech was at least a motivating factor in the employer's actions." *Kildwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012). Defendants contest that Pubentz's speech was constitutionally protected because it was made during the course of an FBI presentation. "[T]he determination of whether speech is constitutionally protected is a question of law for the court." *Houskins v. Sheahan*, 549 F.3d 480, 489 (7th Cir. 2008). "When public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Valentino v. Vill. of S. Chicago Heights*, 575 F.3d 664, 671 (7th Cir. 2009).

To determine the constitutional protections accorded to public employees speech the Supreme Court has developed a two-step inquiry. *Pickering*, 391 U.S. at 568. The first step requires us to determine whether the employee spoke as a citizen on a matter of public concern. *Borough of Duryea, Pa. v. Guarnieri,* 131 S. Ct. 2488, 2493 (2011). If an employee does not address a matter of public concern, "a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a

public agency allegedly in reaction to the employee's behavior." *Connick v. Myers*, 461 U.S. 138, 147 (1983). Even if the employee does speak as a citizen on a matter of public concern, the employee's speech is not automatically privileged. *Borough*, 131 S.Ct. at 2493. Courts must "balance the First Amendment interests of the employee against the interests of the [government], as an employer, in promoting the efficiency of the public service it performs through its employees." *Id.* (quoting *Pickering*, 391 U.S. at 568).

Pubentz argues that the verbal exchange between Pubentz and the presenter at the FBI presentation was relegated to issues that were exclusively of public concern and therefore covered by the First Amendment. Speech that addresses a matter of public concern is any speech "fairly considered as relating to any matter of political, social, or other concern to the community." *Connick*, 461 U.S. at 146. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Id*. at 147-48.

Pubentz asserts that the presentation, concerning the evolution of the Gaza Strip territorial dispute involves an issue of public concern which can provoke spirited debate. Even though the issues discussed at the presentation can provoke emotional discourse, the forum for the discussion and the connection with Pubentz's duties were nonetheless related to her work. The entire national security section of the Chicago FBI

Office was invited to attend the presentation. Pubentz specialized in interpreting Hebrew and additionally is fluent in Arabic, attended the presentation. The event was designed to provide a Palestinian perspective to the Gaza Strip conflict. The presentation was held at a training space in the Chicago FBI Office and was held for the professional enrichment of the employees in attendance. During the course of the presentation Pubentz engaged in a heated discussion with the presenter. Pubentz was observed making known her belief that the speakers comments were "pure propaganda" and "not based on fact." The Court determines that the setting of the presentation and the nature of the matter discussed suggest that the issues were not subject to First Amendment protection.

Even if we were persuaded that Pubentz's speech during the presentation was a matter of public concern, the FBI has an interest in regulating the way presentations are conducted. The imposition of restraints in employment are justified by the consensual nature of the employment relationship and by the unique nature of the government's interest. *Bourough*, 131 S. Ct. at 2494. The Seventh Circuit in *Fairley v. Andrews*, 578 F.3d 518 (7th Cir. 2009), determined that the Constitution does not restrict an employers right to manage the workplace and limit, as well as require, speech. The *Fairley* Court analogized to a situation where an employer had instructed its employees to be silent during work hours on issues relating to their positions. *Id*. at 523. The Court

found that the First Amendment would not prevent the employer from enforcing its requirement of silence. The Court reasoned that it is clear that the First Amendment does not regulate the manner in which an employer requires an employee to perform their job. *See Garcetti v. Ceballos*, 547 U.S. 410, 417-20 (2006).

In this case, the guest speaker was surprised by Pubentz's unwillingness to consider a different perspective on the Gaza Strip conflict. Pubentz argues that England's comment stating that Pubentz has a First Amendment right to express herself is dispositive of the issue. However, England conditions her statement on whether Pubentz is representing herself or if she is representing the FBI. Pubentz's confrontation had the potential to give the speaker a negative impression of the FBI as a whole, as opposed to the perspective of one boisterous linguist. Prior to the event England warned the attendees to maintain composure and consider the forum prior to engaging in confrontation with the presenter. Although Pubentz did not see the email, England's proactive warning underscores the precautions taken to mitigate any negative perception drawn on the FBI as a whole. Accordingly, the Court finds that Pubentz's verbal confrontation with the presenter at the FBI presentation was not a matter of public concern and the FBI had a vested interest in limiting the actions of its employees. Therefore Pubentz's speech is not protected by the First Amendment. The Defendants's motion for summary judgment is granted.

## CONCLUSION

For the aforementioned reasons, Defendants's motion for summary judgment is granted.

_____
Charles P. Kocoras
United States District Judge

Dated: ___March 5, 2013_____